Tony MCANANY, Plaintiff,

v.

ANGEL RECORDS, INC., a subsidiary of Capitol–EMI, Inc. Defendant.

No. 97 Civ. 8216(MGC).

United States District Court, S.D. New York.

Aug. 23, 2002.

Frankel & Abrams, New York City, By: Stuart E. Abrams, for Plaintiff.

Norwick & Schad, New York City, By: Kenneth P. Norwick, for Defendant.

## MEMORANDUM OPINION

CEDARBAUM, District Judge.

Defendant Angel Records, Inc. has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment on plaintiff McAnany's unjust enrichment claim to the extent that it applies to producer royalties for the music album "Chant." Because plaintiff may not create an issue of fact precluding summary judgment by offering an affidavit that contradicts his earlier sworn statement, defendant's motion is granted.

## BACKGROUND

In June of 1993, Tony McAnany, a music industry professional, accepted an offer from Angel Records, a division of EMI Records Group North American ("EMIRG"), for the position of Director of "Artist and Repertoire" ("A & R"). On June 4, 1993, Steve Murphy, President of Angel/EMI Classics, and McAnany executed a letter agreement dated June 3, 1993 "summarizing the terms of [the] offer." This agreement stated, *inter alia*, (1) that McAnany's title would be "Director, A & R"; (2) that his salary would be $90,000; and (3) that "[t]he Company will pay a royalty of 1% of the retail selling price . . . on all albums . . . embodying masters . . . initially released by the Company during the period of your employment which embody performances by artists for whom you have served as (i) the primary A & R signing contact and (ii) the primary A & R contact during the recording of the album." The letter agreement also stated that "[y]ou understand and agree that your employment relationship with EMI Records Group North America is at will and that either party may terminate the employment relationship at any time for any reason whatsoever."

Also on June 4, 1993, Murphy and McAnany executed a letter agreement dated May 21, 1993, "confirm[ing]" the agreement between Angel and McAnany "with respect to [McAnany's] royalty arrangement." This agreement provided that:

In addition to any other compensation which you may be entitled to receive as an employee of the Company, you shall be entitled to receive a royalty ("Royalty") equal to 1% of the retail list price . . . on all albums . . . initially released by the Company during the period of your employment by the Company which embody master recordings ("Masters") of performances by recording artists ("Artists") for whom you have served as (i) the primary A & R signing contact and (ii) the primary A & R contact during the recording of the Master.

Paragraph seven of that agreement also provided that "[t]he provisions of this agreement dealing with your royalty arrangements constitute the entire agreement and will supersede any prior understanding between you and the Company with respect thereto and there is no other contract or guaranty of employment between you and the Company."

In the early 1990s, a two-disc album consisting of recordings of Benedictine monks performing *a capella* chants had been released by EMIRG's European affiliates and had met with huge success. The

chants had been recorded, produced, and released about 20 years earlier by EMIRG's affiliate company in Spain. In 1994, Angel released in the United States a one-disc version of those recordings entitled "Chant," which was also immensely successful.

McAnany contends that in addition to his experience and expertise in the A & R field, he is also an experienced "producer" of musical recordings. The complaint alleges that "[a]t various times before and after June 1993," "Angel agreed to give credit to McAnany by identifying him as the producer on any album on which McAnany served as the producer." According to McAnany, he had a "separate verbal assurance" from Murphy that Angel would pay him a royalty of three percent of the retail selling price of all albums on which he served as the "producer." Furthermore, the complaint alleges that Angel's agreement to compensate plaintiff for his work as a record producer was "separate and distinct" from Angel's agreement to employ plaintiff as Director of A & R. McAnany states that after 1993, in accordance with the "producer" agreement, he served as "producer" for numerous albums recorded and released by Angel. In particular, the complaint alleges that he served as both the "primary A & R contact" and the "producer" for the album entitled "Chant."

It is undisputed that Angel paid no A & R royalties and no producer royalties to McAnany. In a sworn affidavit dated June 12, 1998, Steve Murphy stated that "[a]t no time during Mr. McAnany's employment at Angel ... was any agreement (either oral or written) entered into between him and Angel providing for any additional compensation (including royal-

ties) for any services he may have rendered for Angel as a 'producer' of albums."

The complaint alleges two breach of contract claims. First, it complains that defendant failed to pay A & R royalties to McAnany ("A & R royalties breach of contract claim"). The second claim is that defendant failed to pay McAnany "producer royalties" for numerous albums including but not limited to "Chant" ("producer royalties breach of contract claim"). McAnany's third claim, a claim for "unjust enrichment" is the subject of this motion for partial summary judgment. This claim asserts that "defendant had been unjustly enriched by the amount of the sums wrongfully withheld from him." Plaintiff has subsequently referred to this claim as a claim for "Quantum Meruit."

The complaint also asserts additional claims alleging: (1) defendant materially breached his contractual obligations by failing to give plaintiff producer credit on the albums on which he served as producer ("failure to give credit claim"); (2) defendant violated § 43(a)(1) of the Lanham Act by making false designations of origin of the albums for which plaintiff served as producer ("Lanham Act claim"); (3) plaintiff is entitled to an accounting under his agreements with defendant; (4) plaintiff is entitled to a permanent injunction enjoining and restraining defendant and related entities from distributing any album for which he acted as producer; and (5) defendant's actions constitute an actual and threatened infringement of plaintiff's copyright in the albums for which he served as producer.

On July 17, 1998, after hearing oral argument on a motion to dismiss the complaint, I dismissed plaintiff's producer royalties breach of contract claim,[1] the failure

---

1. On July 17, 1998, I ruled in an oral opinion that the producer royalties breach of contract claim was not actionable under New York law because of the statute of frauds. On February 28, 2002, however, noting that the contract was capable of being performed within a year, I revised the ground for dismissing that claim. I held that the claim was dismissed

to give credit claim, and the Lanham Act claim. I also ruled that plaintiff's arguments for an accounting and a permanent injunction were requests for remedies and not separate causes of action. With respect to plaintiff's copyright claim, I held that no action for copyright infringement could be maintained until the copyright had been registered with the Copyright Office.

On October 12, 2001, I granted defendant's motion for partial summary judgment dismissing the A & R royalties breach of contract claim with respect to "Chant" on the ground that McAnany did not have any contact with the artists who performed the chants recorded in the album, or with the artists' representatives.

## DISCUSSION

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the

because the contract that specified the terms of McAnany's A & R royalties explicitly stated

moving party." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir.1993). But "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### Plaintiff's Unjust Enrichment Claim

McAnany argues that Angel was unjustly enriched by failing to pay him the promised three percent in royalties for his services as "producer" of the highly successful album, Chant. In opposing Angel's motion for partial summary judgment, McAnany submitted a sworn declaration dated February 14, 2002, ("the February 14, 2002 declaration") which contained a section entitled "My Role as the Record Producer of The Chant Album." In this section, McAnany described his work as "producer" as follows:

> I ... listened to numerous Gregorian Chant records in Angel's catalogue and selected the specific recordings that would be used in the *Chant* album. I listened to all of these recordings and made creative decisions as to the selection of desirable recordings and the sequence in which the chants would be heard on the *Chant* album. Again, this was all done with the objective of giving the *Chant* album a sound that would be auraly attractive to a popular music audience. I ... creat[ed] my own cassette tape of the chants I had selected and the sequence in which they would be recorded on the *Chant* album.
>
> After selecting the chants, I then worked in a mixing studio with Roy Hendrickson, a recording engineer.... [A]s the record producer, I was the one

that there was no other contract between the parties.

who made [the creative] decisions. I wanted the record to sound more like a popular music album than a traditional classical music album. Hendrickson and I took several technical steps to accomplish this. First, we digitally re-recorded the chants, changing the dynamics in order to make it seem as though all of the chants were recorded at the same time. Next, we changed the "ambience" or reverberation of the recording to make it sound more like a recording of popular music.... I made a creative decision to re-mix *Chant* with a compressed dynamic range, so that the sound was much more like that of a popular music record than a classical music record.... I also supervised the recording engineer in making changes in the content of some of the recordings— for example, in one case, actually recording a portion of the chant backwards....

After completing the work on *Chant* at the mixing studio, I then proceeded to a mastering studio, Sterling Sound, where I worked with another engineer, Ted Jensen.... Under my supervision, Jensen completed what became the master recording for *Chant*.

Previously, on July 13, 2001, in opposition to Angel's motion for summary judgment with respect to McAnany's breach of contract claim pertaining to Angel's failure to pay him A & R royalties, McAnany had submitted a sworn declaration ("the July 13, 2001 declaration"). This declaration contained a section entitled "My Role as the Primary A & R Signing Contact With Respect to the Master Recordings Embodied in the Chant Album." In this section, McAnany described the services he had performed as "Primary A & R Signing Contact" in relevant part:

I listened carefully to all of the recordings in order to develop what I considered to be an optimal selection and sequence of the chants. Sequencing was an important element to the success of the *Chant* album.... I was striving for a sequence that would be auraly attractive to a popular music audience. I prepared a preliminary sequence, ... refined the sequence a few days later, and came up with a final sequence.... I created my own cassette tape of the chants I had selected, and ... I then worked with recording engineers to create the final master recording for the *Chant* album.

In a second section entitled "My Role as the Primary A & R Contact During the Recording of the Chant Album," also contained in the July 13, 2001 declaration, McAnany stated:

After selecting the sequence of the chants, I took the compact disks to a mixing studio where I worked with Roy Hendrickson, a recording engineer. We digitally re-recorded the chants, changing the dynamics in order to make it seem as though all of the chants were recorded at the same time. We changed the "ambience" or reverberation of the recording to make it sound more like a recording of popular music. Similarly, we made other changes in the dynamics of the recording.... I decided to re-mix *Chant* with a compressed dynamic range so that the sound was much more like a popular music record than a classical music record. At the time, this was a very innovative way of mixing an album of classical music, and "purists" would not have approved of what we did. Nevertheless, I wanted to have an album that would be accessible to a popular music audience.... We also made changes in the content of some of the recordings, for example, in one case actually recording a portion of the chant backwards....

After creating the DAT [Digital Audio Tape] for *Chant* at the mixing studio, I

then proceeded to a mastering studio, Sterling Sound, where I worked with another engineer, Ted Jensen. There are many creative aspects involved in the technical process of mastering an album.... Together, Jensen and I created what became the master recording for *Chant.*

A comparison between the February 14, 2002 declaration and the July 13, 2001 declaration shows everything that McAnany says he did as "producer" is included in what he previously said he did as the primary A & R contact for Chant. The overlap of McAnany's description of his A & R role and his "producer" role directly contradicts his claim that he rendered "producer" services that were outside of the scope of his written A & R agreement with the defendant, pursuant to a "separate and distinct" "producer" agreement that he entered into with defendant. Furthermore, although McAnany attempts to distinguish the role of a record "producer" from that of an A & R executive by arguing that a record "producer" is a "creative artist," in contrast to an A & R executive who performs a "business function," his July 13, 2001 declaration includes his creative decisions in its description of his A & R role for *Chant.*

The rule is well-settled in this circuit that a party may not create a material issue of fact by submitting an affidavit that contradicts his own prior sworn statement. *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991). *See also Langman Fabrics, Inc. v. Graff Californiawear Inc.,* 160 F.3d 106, 112 (2d Cir.1998). "[A] material issue of fact may be revealed by [a party's] subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not asked sufficiently precise questions to elicit the amplification or explanation." *Langman,* 160 F.3d at 112

(citing *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted)). "If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Id.*

Plaintiff's February 14, 2002 declaration with respect to his "producer" royalties unjust enrichment claim does not "amplify or explain," but directly contradicts his July 13, 2001 declaration with respect to his A & R royalties breach of contract claim. His earlier declaration specifically included in his work as A & R director all of what he now declares were services rendered in his capacity as "producer." That "earlier account" was not a consequence of "[in] sufficiently precise questioning," and was not "ambiguous, confusing or simply incomplete." Accordingly, there is *no genuine issue of material fact* regarding whether defendant was unjustly enriched by the "producer" services that were rendered by McAnany.

### CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is granted. Counsel are directed to attend a status conference on September 9, 2002 at 3 p.m.

SO ORDERED.